UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ALPHONSO R.,[1]

      Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.

_____

Case No. 2:23-cv-11085
District Judge Linda V. Parker
Magistrate Judge Kimberly G. Altman

**REPORT AND RECOMMENDATION ON
CROSS MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 8, 11)**

I.      Introduction

This is a social security case.  Plaintiff Alphonso R. brings this action under 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of Social Security denying his application for Disability Insurance Benefits (DIB) under the Social Security Act (the Act).  Both parties have filed motions for summary judgment, (ECF Nos. 8, 11), which have been referred to the undersigned for a Report and Recommendation under 28 U.S.C. § 636(b)(1)(B), (ECF No. 7).

_____

[1] Consistent with guidance regarding privacy concerns in Social Security cases by the Judicial Conference Committee on Court Administration and Case Management, this district has adopted a policy to identify plaintiffs by only their first names and last initials.  *See also* Fed. R. Civ. P. 5.2(c)(2)(B).

As will be explained, the ALJ found that Plaintiff was disabled as of March 7, 2021 but not prior to that date, concluding that Plaintiff was capable of sedentary work with restrictions.  Thus, the issue is whether substantial evidence supports the ALJ's determination that Plaintiff was not disabled under the Act from the alleged onset date of February 12, 2018 until the disability date of March 7, 2021.

For the reasons set forth below, the undersigned **RECOMMENDS** that Plaintiff's motion, (ECF No. 8), be **DENIED**; the Commissioner's motion, (ECF No. 11), be **GRANTED**; and the decision of the Administrative Law Judge be **AFFIRMED**.

## II.    Background

### A.    Procedural History

Plaintiff is 53 years old and filed an application for disability benefits under Title II of the Social Security Act on November 18, 2019, alleging a disability onset date of February 12, 2018.  (ECF No. 4-1, PageID.242).  Under Social Security Administration agency regulations, Plaintiff's age category was that of a younger person (45-49 years old) prior to the disability onset date.[2]  (*Id.*,

---

[2] In determining whether a person is disabled, chronological age is considered "in combination with residual functional capacity, education, and work experience." 20 C.F.R. § 404.1563(a).  For persons under age 50, it is generally considered that the person's age will not seriously affect their ability to adjust to other work.  20 C.F.R. § 404.1563(c).  But in some circumstances, persons aged 45-49 are

PageID.39); 20 C.F.R. § 404.1563.  But on March 7, 2021, Plaintiff's age category

changed to that of a person closely approaching advanced age.[3]  20 C.F.R. §

404.1563.  He reported completing one year of college in 1989; military and police

training; as well as electrical and mechanical training.  (ECF No. 4-1, PageID.272).

Before he became disabled, Plaintiff worked as a police officer in the Wayne

County Sheriff's Department for over 20 years.  (*Id.*, PageID.272).  This job

required him to escort, monitor, and transport inmates, and sometimes involved

restraining inmates as needed.  (*Id.*, PageID.273).  In his application, Plaintiff

alleged disability due to stroke and symptoms of numbness; uncontrollable high

blood pressure; loss of balance; inability to concentrate; diabetes; depression;

anger issues; PTSD; arthritis; tendinitis; hearing loss; and "rhumatoritis."  (*Id.*,

PageID.86-87).

Plaintiff's application was denied initially on August 18, 2020, and upon

reconsideration on January 15, 2021.  (*Id.*, PageID.28).  Plaintiff then submitted a

written request for a hearing before an Administrative Law Judge (ALJ) and his

hearing was held before ALJ Lauren Burstein.  (*Id.*).  Due to the COVID-19

---

considered "more limited in their ability to adjust to other work than persons who
have not attained age 45."  *Id.*

[3] For persons aged 50-54, it is considered that their age, along with a severe
impairment(s) and limited work experience, may seriously affect their ability to
adjust to other work.  20 C.F.R. § 404.1563(d).

3

pandemic, Plaintiff appeared and testified by online video at the hearing, as did a vocational expert. (*Id.*). Plaintiff was represented by counsel and offered the following testimony:

- Plaintiff is living with his daughter and his granddaughter, who both help take care of him. (*Id.*, PageID.56, 66, 69).

- He graduated high school and joined the Army thereafter, serving approximately six and a half years. (*Id.*, PageID.57-58).

- During his military service, he also took some college courses and worked as a mechanic. (*Id.*, PageID.58).

- He last worked in February 2018 for the Wayne County Sheriff's Department but stopped working after his stroke. (*Id.*, PageID.59, 60-61).

- Since 2018, he has sought other employment and was scheduled to start a new position in December 2020 but felt "too messed up to work" because the entire left side of his body went numb the day before his start date. (*Id.*, PageID.60-61).

- He is unable to work because he "can't do two things at one time," such as thinking and walking simultaneously. (*Id.*, PageID.62).

- He is unable to feel comfortable and estimated that he is only able to sit for 5-10 minutes comfortably at one time. (*Id.*, PageID.62-63). He also is unable to stand for long periods, estimating he could stand for only three or

4

four minutes comfortably.  (*Id.*).

- He can only take three or four steps before falling or losing balance.  (*Id.*, PageID.63).

- He is unable to dress or shower himself and his daughter helps with those tasks, as well as cooking for him and feeding him.  (*Id.*, PageID.65-66).  He also does not assist with household chores.  (*Id.*, PageID.66).

- He nearly always uses a cane to move around, but also uses a walker at night when going to the bathroom.  (*Id.*, PageID.68).

- Aside from a short relapse, he no longer consumes alcohol.  (*Id.*, PageID.67).

On January 12, 2022, the ALJ issued a decision finding that Plaintiff "was not disabled prior to March 7, 2021, but became disabled on that date and has continued to be disabled through [January 12, 2022].  His disability is expected to last twelve months past the onset date."  (*Id*., PageID.40).  The ALJ also noted that "[m]edical improvement is expected with appropriate treatment.  Consequently, a continuing disability review is recommended in 18 months."[4]  (*Id.*, PageID.41).  On March 9, 2023, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  (*Id*., PageID.13-15).  Plaintiff timely filed

---

[4] The administrative record does not reflect whether any continuing disability review was conducted.

for judicial review of the final decision.  (ECF No. 1).

B.    Medical Evidence

The medical records show progress notes from as early as January 2017—one year prior to Plaintiff's stroke—that reflect a history of uncontrolled hypertension and diabetes mellitus requiring insulin.  (*Id.*, PageID.591).  On February 12, 2018, Plaintiff went to the emergency room with unsteadiness in his gait that began that same morning.  (*Id.*, PageID.384).  Upon admittance, his blood pressure was 132 over 106 but later increased to 200 over 100.[5]  (*Id.*, PageID.387). A CT scan of the head and neck showed minimal calcification in the cavernous segment of the left ICA (brain artery) but was otherwise normal.  (*Id.*).  Manual muscle testing revealed normal muscle strength (5 out of 5) in both the upper and lower extremities except for Plaintiff's left- and right-side hip flexion, which showed less strength (3 out of 5).  (*Id.*, PageID.392).  An MRI of Plaintiff's brain showed "acute stroke in the right basal ganglia and in the left lentiform, and a subacute stroke in the left thalamus as well as remote focal infarct in the right caudate nucleus."  (*Id.*, PageID.398).  An echocardiogram showed a "grade II diastolic dysfunction, mild increase in [left ventricle] wall thickness, and [ejection fraction of] 55-60%."  (*Id.*).  As a result, Plaintiff received a cardiac monitor for

---

[5] Normal blood pressure is 120 over 80 or lower.  U.S. FOOD & DRUG ADMINISTRATION, https://www.fda.gov/drugs/special-features/high-blood-pressure-understanding-silent-killer (last visited July 15, 2024).

thirty days and was sent to Rehabilitation Institute of Michigan from February 16, 2018, through February 23, 2018, for inpatient rehabilitation. (*Id.*, PageID.398, 400, 443). He was later discharged home with a walker. (*Id.*, PageID.443).

At a March 6, 2018 physical therapy appointment with physical therapist Julie Yonkus, Plaintiff reported that he "feels he has gotten a lot better" and his left arm and hand showed considerable improvement. (*Id.*, PageID.443-444). On April 11, 2018, Plaintiff went to his primary care physician, Dr. Maridel Hernandez, for a follow-up visit regarding his stroke. (*Id.*, PageID.584). At this visit, Dr. Hernandez noted that Plaintiff was no longer in a wheelchair but still used a cane. (*Id.*). On April 24, 2018, Plaintiff presented for physical therapy using a 4-wheeled walker but claimed that he did not need the device and only used it at his wife's insistence. (*Id.*, PageID.427). At this visit, Plaintiff used the walker but while in the clinic, he was able to ambulate without an assistive device. (*Id.*). On May 10, 2018, Plaintiff reported for physical therapy with a cane in the right hand and was observed to have mild stiffness in his lower left extremity. (*Id.*, PageID.423).

Regarding Plaintiff's mental impairments, he began taking Sertraline on April 11, 2018, after he was assessed by Dr. Hernandez as having PTSD with significant depression and anger due to the circumstances at work leading up to his stroke. (*Id.*, PageID.584). On October 23, 2018, Plaintiff presented to Dr.

7

Hernandez for a physical exam and his measured blood sugar level was over 556.[6]

(*Id.*, PageID.579).  His blood sugar was lower on a December 19, 2018 follow-up

visit, measuring 273, which Plaintiff attributed to having eaten candy just prior to

the visit.  (*Id.*, PageID.576).  Dr. Hernandez noted that Plaintiff needed to increase

his activity levels, rather than sitting and watching TV all day, if he wanted to

return to work, and assessed Plaintiff as having generalized anxiety disorder.  (*Id.*,

PageID.576, 579).  Dr. Hernandez's notes from an August 23, 2019 visit reflect

that Plaintiff had uncontrolled hypertension with a blood pressure of 170 over 120

(170 over 100 after recheck), that his PTSD was from his time in the military, and

that this PTSD contributed to his underlying hypertension.  (*Id.*, PageID.462).  On

September 10, 2019, Plaintiff saw Dr. Hernandez for a checkup and stated that he

was not happy about going to anger management because he does not like to talk

one on one.  (*Id.*, PageID.571).  Later, on September 20, 2019, Dr. Hernandez

again noted uncontrolled hypertension due to increased anxiety to return to work.

(*Id.*, PageID.460).  At this visit, Dr. Hernandez prepared a written letter for

Plaintiff to return to work so long as he continued his medication.  (*Id.*).

On December 31, 2019, Dr. Hernandez sent Plaintiff to the emergency room

due to his elevated blood pressure level.  (*Id.*, PageID.468).  At the emergency

---

[6] A blood sugar level less than 140 is considered normal.  MAYO CLINIC,
https://www.mayoclinic.org/diseases-conditions/diabetes/diagnosis-treatment/drc-
20371451 (last visited July 10, 2024).

room, it was noted that Plaintiff was taking hydralazine (hypertension medication) but only twice per day, rather than the prescribed three times per day. (*Id.*). He was provided IV insulin and fluids, advised to take his hypertension medication as directed, and discharged. (*Id.*, PageID.470). A physical examination on January 17, 2020, by Dr. Hernandez, noted a blood pressure of 170 over 110; equal and intact grip and strength; and trace edema (swelling). (*Id.*, PageID.568). Dr. Hernandez indicated that, should Plaintiff return to work in his then-current condition, he may have a more lethal or debilitating stroke. (*Id.*). A February 3, 2020 letter from the VA reported a recent sleep study that showed Plaintiff had severe sleep apnea (greater than 30 episodes per hour of sleep) with low oxygen saturation, and as a result, PAP (positive airway pressure) therapy was prescribed. (*Id.*, PageID.482). On May 7, 2020, Dr. Hernandez advised Plaintiff that the best course for him would be to no longer work as a deputy sheriff, due to accommodations he may need regarding his personal health and because of the increased risk of a more severe stroke. (*Id.*, PageID.564). In a May 15, 2020 letter from Dr. Hernandez to the Wayne County Disability Manager, she indicated that Plaintiff was sent to therapy but only went a few times and not consistently. (*Id.*, PageID.819).

Plaintiff presented for a mental health consultation with clinical psychologist Dr. Ian Sherwood on July 22, 2020, where he described recent stresses related to

losing his job, losing his health insurance, as well as the recent deaths of a close friend and a coworker due to the COVID-19 pandemic. (*Id.*, PageID.673). Clinically, he presented with depressed mood, appropriate affect, no psychosis or mania, good judgment, fair insight, and no suicidal or homicidal ideation. (*Id.*, PageID.674). Dr. Sherwood assessed Plaintiff as having unspecified trauma and stressor-related disorder, unspecified depressive disorder, and uncomplicated alcohol abuse but no significant issues. (*Id.*, PageID.674-675).

On July 27, 2020, Plaintiff was evaluated by Dr. Andrew Vosburgh, who noted Plaintiff's elevated blood pressure in his left arm was 206 over 128; 203 over 130 in his right arm; and Plaintiff suffered from hemiparesis (one-sided muscle weakness), with left-side strength of 4 out of 5 as compared to the right side (which showed 5 out of 5 strength). (*Id.*, PageID.963). Otherwise, he had no facial droop or asymmetry, and his heart and lung exams were normal. (*Id.*). Plaintiff was advised to go to the emergency room for urgent evaluation and Dr. Vosburgh recommended reexamination in one year. (*Id.*, PageID.964).

On August 5, 2020, Plaintiff underwent a consultative psychiatric evaluation with Dr. Atara Abramsky. (*Id.*, PageID.603-609). At the evaluation, Plaintiff reported an inability to work due to problems interacting appropriately with others as well as mobility problems and cognitive impairments. (*Id.*, PageID.603). He also described experiencing confusion, disorganization, poor concentration, and

mobility issues since his February 2018 stroke.  (*Id.*).  He further reported mood

disturbances including sad mood, decreased sleep, anxiety, and anhedonia (lack of

enjoyment from life).  (*Id.*).  Dr. Abramsky noted Plaintiff's status as an Army

veteran, his repeated combat experience, the very traumatic events he witnessed

during his military service, and the resulting poor sleep, nightmares,

hypervigilance, exaggerated startle response, and avoidance issues suffered by

Plaintiff.  (*Id.*).  The examination also showed Plaintiff had appropriate dress for

the weather but poor grooming and hygiene; good eye contact; was polite and

cooperative behavior but had a sullen and dysphoric mood; restricted affect; logical

and linear thought process that was goal-directed; no suicidal or homicidal

ideation; no paranoia or delusions; orientation to date, month, year, and day; fair

immediate memory but poor recent memory; good remote memory; good

calculational ability; good fund of general information; good abstract thinking;

good similarities and differences; and good judgment.  (*Id.*, PageID.605-607).  Dr.

Abramsky diagnosed Plaintiff with PTSD by history and depressive disorder due to

a medical condition but ruled out any mild neurocognitive disorder.  (*Id.*,

PageID.607).  Dr. Abramsky also opined that:

- Plaintiff may have moderate impairments in understanding, remembering, or
  applying information;

- Plaintiff may have moderate impairments in concentration, persistence, or

pace;

- Plaintiff may have moderate impairments in engaging in social interactions;

- Plaintiff may have moderate impairments in adapting or managing himself.

(*Id.*).

On the same day as the Dr. Abramsky evaluation, August 5, 2020, Dr. Harold Nims also conducted an internal medicine consultative examination of Plaintiff. (*Id.*, PageID.610-618). At the exam, Plaintiff reported that his left-sided numbness had mostly resolved but he still had a heavy tingling-type feeling on the left side of his body. (*Id.*, PageID.610). Plaintiff further reported that he could use his hands as needed but he had problems with his balance, having fallen three to four times in the last year. (*Id.*). And he stated that he cared for his own needs, including cleaning and cooking, and that he was independent in selfcare tasks except for some physical limitations with putting on his socks. (*Id.*). A physical examination showed:

- Blood pressure was 212 over 134;

- Normal gait with use of a single-prong cane;

- Stability in standing, sitting, and supine (lying face upward) positions;

- Lung fields clear to percussion and auscultation (listening with stethoscope);

- Regular heart rate, with no murmurs or gallops;

- No edema (swelling);

12

- Full range of motion of all tested joints;

- Normal grip strength in both hands, with the ability to write with the dominant hand and pickup coins with either hand;

- Ability to stand on one leg at a time without difficulty, with normal results for the straight leg raise test in the sitting and supine positions;

- Intact cranial nerves, with no evidence of atrophy or sensory loss;

- Increased deep tendon reflexes in the lower extremities but with the ability to walk on toes and heels, the ability to bend, difficulty with tandem gait, and the ability to squat halfway.

(*Id.*, PageID.610-618).  Dr. Nims also diagnosed Plaintiff with residual problems with balance, cognition, and memory due to the prior stroke; a long-term history of uncontrolled hypertension with extremely high blood pressure; and Type II diabetes.  (*Id.*, PageID.614).  Lab results from the same evaluation showed an elevated HbA1C level (Type II diabetes test) of 10.5%.  (*Id.*, PageID.677).  A CT scan of Plaintiff's head showed no acute intracranial abnormalities.  (*Id.*, PageID.813-814).  At the conclusion of his examination, Dr. Nims opined that Plaintiff's "ability to perform work-related activities such as bending, stooping, lifting, walking, crawling, squatting, carrying and traveling as well as pushing and pulling heavy objects [was] at least mildly impaired" and that Plaintiff did not require a walking aid.  (*Id.*, PageID.614, 616).

13

During a phone appointment to the VA Medical Center on August 10, 2020,
Plaintiff stated he would be traveling to Minnesota to check on his brother for an
unknown period of time.  (*Id.*, PageID.651).

On August 12, 2020, Dr. Colin King, a State agency psychiatric consultant,
opined that Plaintiff remained capable of managing simple tasks mentally within a
work environment with only routine, predictable work stressors.  (*Id.*,
PageID.101).

During another phone appointment with Dr. Loricel Escote on August 31,
2020, Plaintiff's home blood pressure showed 193 over 140.  (*Id.*, PageID.775).
Dr. Escote's notes reflect that Plaintiff's poor compliance with his medication
regimen has contributed to his current state.  (*Id.*, PageID.775).  A September 18,
2020 note by Registered Nurse Catherine Ramsey from the VA reflects that
Plaintiff had continued poor compliance regarding his current medical condition
and was encouraged to follow all medical recommendations and fully comply with
his medication regimen.  (*Id.*, PageID.747).  At the visit, he declined insulin and
the records note he was taking metformin and glipizide.  (*Id.*).

On September 27, 2020, Dr. Hernandez wrote a report stating that Plaintiff
had disorganization of motor function in two extremities with extreme limitation in
the ability to stand up from a seated position; balance while standing or walking;

14

and use the upper extremities.[7]  (*Id.*, PageID.694-695).  She further opined that Plaintiff was markedly limited in understanding, remembering, or applying information; interacting with others; and concentrating, persisting, or maintaining pace.  (*Id.*).

On September 28, 2020, a review of Plaintiff's CPAP adherence from the prior month notes that he was not using the device because he had been on vacation.  (*Id.*, PageID.737).  When he did use the device, the mask would sometimes fall off during sleep.  (*Id.*).  Lab results from December 1, 2020, indicated that Plaintiff's diabetes control improved, and he was now at his goal with an HbA1C of 6.5%.  (*Id.*, PageID.719).  On December 10, 2020, Plaintiff reported that he was set to begin a new job as a police officer and stated he was bored.  (*Id.*, PageID.910).  On a January 2021 visit with Dr. Abdullahi Ahmed, the medical notes reflect that Plaintiff was 80% compliant with his CPAP usage and he reported good benefits using the CPAP therapy.  (*Id.*, PageID.904).

On January, 13, 2021, another State agency psychological consultant, Dr. Loren Levy, opined that Plaintiff retained the capacity for simple, routine, repetitive tasks with brief, occasional and superficial social interaction.  (*Id.*, PageID.116).

---

[7] It is unclear from the medical record how Dr. Hernandez made this assessment of Plaintiff, as she states in the report that he is ***not*** currently treating at her office due to cost/financial issues.  (*Id.*, PageID.694) (emphasis added).

In an April 2021 visit with Dr. Ahmed, Plaintiff again reported good benefits from his CPAP therapy and reported sleeping much better.  (*Id.*, PageID.879).  Dr. Lanying Brown's notes from a June 7, 2021 visit reflect that Plaintiff was again noncompliant with his prescribed blood pressure medication but felt fine otherwise and his blood pressure was recorded at 152 over 91.  (*Id.*, PageID.863-866).

On a September 1, 2021 visit to the emergency room, Plaintiff stated he was not in distress and denied falling within the past year but indicated his blood pressure was always poorly controlled.  (*Id.*, PageID.838, 842).  He was discharged in stable and ambulatory condition.  (*Id.*, PageID.838).

On November 19, 2021, Plaintiff was referred to the emergency room by his primary care physician due to hypertension.  (*Id.*, PageID.991).  He was given his normal home blood pressure medications and his blood pressure improved.  (*Id.*).  An EKG showed T wave inversions (manifestation of myocardial injury).  (*Id.*).  He described his high blood pressure as being asymptomatic for the last several years.  (*Id.*, PageID.993).  A chest x-ray showed minimal atelectasis (collapse) or scarring in the left lung.  (*Id.*).  Plaintiff was evaluated by cardiology and adjustments were made to his antihypertensive medication.  (*Id.*, PageID.1002).

### III.    Framework for Disability Determinations (the Five Steps)

Under the Act, DIB and SSI are available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act

defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Carpenter v. Comm'r of Soc. Sec.*, No. 08-10279, 2008 WL 4793424, at *4 (E.D.

Mich. Oct. 31, 2008) (citing 20 C.F.R. § 404.1520); *see also Heston v. Comm'r of*

*Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the

claimant throughout the first four steps. . . .  If the analysis reaches the fifth step

without a finding that claimant is not disabled, the burden transfers to the

[Commissioner]."  *Preslar v. Sec'y of Health & Hum. Servs.*, 14 F.3d 1107, 1110

(6th Cir. 1994).

Following this five-step sequential analysis, the ALJ found that Plaintiff was

not disabled prior to March 7, 2021, but became disabled under the Act on that

date.  (ECF No. 4-1, PageID.39-40).  At Step One, the ALJ found that Plaintiff had

not engaged in substantial gainful activity since his alleged onset date.[8]  (*Id.*,

PageID.31).  At Step Two, the ALJ found that Plaintiff had the severe impairments

of status post cerebral vascular accident (CVA), hypertension, diabetes mellitus,

obstructive sleep apnea (OSA), generalized anxiety disorder, depression, and post-

traumatic stress disorder (PTSD).  (*Id.*).  The ALJ also found that Plaintiff had the

non-severe impairments of chronic kidney disease (CKD) and obesity.  (*Id.*).  At

Step Three, the ALJ found that none of Plaintiff's impairments met or medically

equaled a listed impairment.  (*Id.*, PageID.32).

The ALJ then assessed Plaintiff's residual functional capacity (RFC),

---

[8] The ALJ found that Plaintiff earned $46,333.94 in 2018, which is greater than the
allowed SGA level, but noted that this amount was a significant decrease from
Plaintiff's prior yearly earnings and found the amount was consistent with
Plaintiff's reported last day of work on February 12, 2018.  (*Id.*, PageID.31).

concluding that since February 12, 2018, until the disability date of March 7, 2021,

he was capable of performing sedentary work as defined in 20 C.F.R. §

404.1567(a) except:

> occasional climbing of ramps and stairs; no climbing of ladders, ropes, or scaffolds; no balancing, as defined by the Selected Characteristics of Occupation (SCO); no exposure to unprotected heights or operation of hazardous machinery; no commercial driving; requires use of a handheld assistive device for prolonged ambulation or on uneven or hazardous terrain; can understand, remember, and apply simple instructions; can concentrate, persist, or remain on pace doing simple, routine tasks; occasional interaction with the general public; and no tandem tasks.

(*Id.*, PageID.33).

At Step Four, the ALJ found that since February 12, 2018, Plaintiff was

unable to perform any past relevant work. (*Id.*, PageID.38). But in considering

Plaintiff's age, the ALJ made two findings: (1) at his disability onset date,

Plaintiff's age category under the Act was that of a younger individual age 45-49;

and (2) after March 7, 2021, Plaintiff's age category under the Act changed to an

individual closely approaching advanced age. (*Id.*, PageID.39). Thus, in

considering Plaintiff's age, education, work experience, and RFC, the ALJ

determined that prior to March 7, 2021, Plaintiff could perform the jobs of

addressor (140,000 jobs nationally), production inspector (58,000 jobs), and

production assembler (55,000 jobs), which exist in significant numbers in the

national economy. (*Id.*). Beginning on March 7, 2021, Plaintiff's age category

changed and thus, in considering Plaintiff's age, education, work experience, and

RFC, the ALJ determined that there were no jobs that exist in significant numbers

in the national economy that Plaintiff could perform.  (*Id.*, PageID.40).  As a result,

the ALJ concluded that Plaintiff was not disabled under the Act prior to March 7,

2021, but became disabled on that date under the Act.  (*Id.*).

## IV.    Standard of Review

A district court has jurisdiction to review the Commissioner's final

administrative decision under 42 U.S.C. § 405(g).  Although a court can examine

portions of the record that were not evaluated by the ALJ, *Walker v. Sec. of Health*

*& Hum. Servs.*, 884 F.2d 241, 245 (6th Cir. 1989), its role is a limited one.  Judicial

review is constrained to deciding whether the ALJ applied the proper legal

standards in making his or her decision, and whether the record contains

substantial evidence supporting that decision.  *Tucker v. Comm'r of Soc. Sec.*, 775

F. App'x 220, 224-25 (6th Cir. 2019); *see also Bass v. McMahon*, 499 F.3d 506,

509 (6th Cir. 2007) (noting that courts should not retry the case, resolve conflicts

of evidence, or make credibility determinations); *Biestek v. Comm'r of Soc. Sec.*,

880 F.3d 778, 783 (6th Cir. 2017) (same), *aff'd sub nom. Biestek v. Berryhill*, 139

S. Ct. 1148 (2019).

An ALJ's factual findings must be supported by "substantial evidence."  42

U.S.C. § 405(g).  The Supreme Court has explained:

> Under the substantial-evidence standard, a court looks to an existing
> administrative record and asks whether it contains sufficient evidence
> to support the agency's factual determinations.   And whatever the
> meaning of substantial in other contexts, the threshold for such
> evidentiary sufficiency is not high.   Substantial evidence, this Court has
> said, is more than a mere scintilla.   It means—and means only—such
> relevant evidence as a reasonable mind might accept as adequate to
> support a conclusion.

*Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (cleaned up).

In making "substantial evidence" the relevant standard, the law preserves the

judiciary's ability to review decisions by administrative agencies, but it does not

grant courts the right to review the evidence de novo.   *Moruzzi v. Comm'r of Soc.*

*Sec.*, 759 F. App'x 396, 402 (6th Cir. 2018) ("'The substantial-evidence standard .

. . presupposes that there is a zone of choice within which the decisionmakers can

go either way, without interference by the courts.'" (quoting *Blakley v. Comm'r of*

*Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009))).   An ALJ's factual findings are

therefore subject to multi-tiered review, but those findings are conclusive unless

the record lacks sufficient evidence to support them.   *Biestek*, 139 S. Ct. at 1154.

Although the substantial evidence standard is deferential, it is not trivial.

The court must "'take into account whatever in the record fairly detracts from [the]

weight'" of the Commissioner's decision.   *TNS, Inc. v. NLRB*, 296 F.3d 384, 395

(6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487

(1951)).   Nevertheless, "if substantial evidence supports the ALJ's decision, this

Court defers to that finding even if there is substantial evidence in the record that

21

would have supported an opposite conclusion." *Blakley*, 581 F.3d at 406 (internal

quotation marks and citation omitted).  Finally, even if the ALJ's decision meets

the substantial evidence standard, "a decision of the Commissioner will not be

upheld where the [Social Security Administration (SSA)] fails to follow its own

regulations and where that error prejudices a claimant on the merits or deprives the

claimant of a substantial right." *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647,

651 (6th Cir. 2009) (internal quotation marks and citations omitted).

V.    Analysis

A.    Parties' Arguments

Plaintiff agrees with the ALJ's finding that he was disabled as of March 7,

2021, but argues that the ALJ (1) did not properly evaluate Dr. Hernandez's

medical opinion under current regulations; and (2) did not adequately support his

finding that Plaintiff's impairments before the disability date failed to meet or

medically equal the requirements of Listing 11.04.  In response, the Commissioner

argues that both findings were supported by substantial evidence.

B.    Opinion Evidence

1.    Legal Standard

When evaluating a medical opinion, the ALJ must articulate "how

persuasive [he] find[s] all of the medical opinions and all of the prior

administrative medical findings in [the claimant's] case record."  20 C.F.R. §

22

404.1520c(b).  The ALJ evaluates the persuasiveness of the medical opinions and
prior administrative medical findings by utilizing the following five factors: (1)
supportability; (2) consistency; (3) relationship with the claimant; (4)
specialization; and (5) other factors.  § 404.1520c(c).  Supportability and
consistency are the most important factors and the ALJ must explain how he
considered these factors in his decision.  § 404.1520c(b)(2).

### 2.    Medical Opinions of Record

Regarding Plaintiff's physical and mental limitations, the ALJ considered
the opinion of Plaintiff's primary care physician, Dr. Hernandez.  (ECF No. 4-1,
PageID.37-38).  The ALJ found Dr. Hernandez's medical opinion unpersuasive for
three reasons.  (*Id.*).  First, Dr. Hernandez's opinion was not sufficiently supported
by strong enough reasoning for the significantly disabling restrictions.  (*Id.*).
Second, Dr. Hernandez indicated in her opinion that Plaintiff was not currently
treating at her clinic because of financial issues.  (*Id.*).  Lastly, her opinion as to
Plaintiff's psychiatric functioning was inconsistent with the opinion of Dr.
Abramsky, who also evaluated Plaintiff and, unlike Dr. Hernandez, was a
professional in the mental health field.  (*Id.*).

On September 27, 2020, Dr. Hernandez authored an evaluation of Plaintiff's
impairments.  (*Id.*, PageID.694-695).  She stated that she had treated Plaintiff for
over five years but that he was not currently treating at her facility because of

23

financial issues.  (*Id.*, PageID.694).  She opined that Plaintiff had sensory or motor aphasia resulting in ineffective speech or communication that persisted for at least three months after his stroke.  (*Id.*).  She also opined that Plaintiff had disorganization of motor function in two extremities along with extreme limitation in his ability to: stand up from a seated position; balance while standing or walking; or use the upper extremities; and persisting for at least three consecutive months after the stroke.  (*Id.*).  She further opined that Plaintiff had marked limitation in both his physical functioning and in the following four areas of mental functioning: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself.  (*Id.*, PageID.694-695).  Lastly, Dr. Hernandez found Plaintiff to have the following stroke residuals that could interfere with his ability to perform simple work in a low stress work environment:

- Difficulty with focus, concentration, immediate recall, and is easily angered, resulting in increases in his blood pressure;

- Suffers from word finding dysarthria (slurred speech) that worsened with his stroke and was complicated by his diabetes;

- Slow reaction time with information processing and his insight to action has worsened;

- Because of the type of stroke Plaintiff sustained, recurrence with a worse outcome is a possibility, with potentially devastating/debilitating effects.

(*Id.*, PageID.695).

The ALJ found Dr. Hernandez's opinion unpersuasive because it was "not sufficiently supported by strong enough reasoning for the significantly disabling restrictions." (*Id.*, PageID.37). An examination of Dr. Hernandez's two-page opinion shows that the first page consists of a series of pre-written questions designed to determine whether a patient meets Listing 11.04.[9] (*Id.*, PageID.694). Dr. Hernandez checked the yes box for each question, indicating Plaintiff met each

---

[9] To meet Listing 11.04, an individual, having suffered a stroke, must satisfy any one of three potential conditions:

1) an individual must exhibit "[s]ensory or motor aphasia resulting in ineffective speech or communication persisting for at least 3 consecutive months after the insult [(cause of injury)]," 20 C.F.R. Pt. 404, Subpt. P., App.'x 1, § 11.04A;

2) an individual must demonstrate "[d]isorganization of motor function in two extremities, resulting in an extreme limitation in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities, persisting for at least 3 consecutive months after the insult [(cause of injury)]," *id.* at § 11.04B; and

3) an individual must show "[m]arked limitation in physical functioning and in one of the following areas of mental functioning, both persisting for at least 3 consecutive months after the insult [(cause of injury)]: [1] Understanding, remembering, or applying information; or [2] Interacting with others; or [3] Concentrating, persisting, or maintaining pace; or [4] Adapting or managing oneself," *id.* at § 11.04C.

and every condition required to meet Listing 11.04.  (*Id.*).  Dr. Hernandez also

indicated that Plaintiff experienced marked limitations in every single area of

mental functioning.  (*Id.*, PageID.694-695).  On the second page of her opinion,

Dr. Hernandez also checked yes to the pre-written question of whether Plaintiff

had "other stroke residuals that could interfere with [his] ability to perform simple

work in a low stress work environment."  (*Id.*, PageID.695).  And when asked to

specifically elaborate on these stroke residuals, Dr. Hernandez only cited

Plaintiff's various symptoms in her response.  (*Id.*)

The ALJ further explained that Plaintiff's lack of current treatment with Dr.

Hernandez reasonably called into question whether Dr. Hernandez was up to date

on Plaintiff's condition and current functioning, and thus called into question the

opinion's ultimate reliability.  (*Id.*, PageID.37-38).  The ALJ also found that Dr.

Hernandez's opinion as to Plaintiff's psychiatric functioning contradicted the

opinion of Dr. Abramsky, who is a professional in the mental health field.  (*Id.*,

PageID.38).  For example, while Dr. Hernandez stated that Plaintiff had marked

limitations in all areas of mental functioning, Dr. Abramsky found Plaintiff only

had moderate limitations in some, but not all, areas of mental functioning.  (*Id.*,

PageID.607, 694-695).  And while Dr. Hernandez maintained that Plaintiff had

"stroke residuals" that could interfere with Plaintiff's ability to perform simple

work in a low stress environment, Dr. Abramsky noted no such limitations.  (*Id.*,

PageID.603-609).  Also, unlike Dr. Hernandez, Dr. Abramsky did not note any

limitations in Plaintiff's ability to interact with others.  (*Id.*).  Rather, although Dr.

Abramsky found Plaintiff's mood to be sullen and dysphoric (unhappy), she

described Plaintiff as "polite and cooperative" throughout the assessment and

noted Plaintiff put forth adequate effort on each requested task.  (*Id.*, PageID.605).

Based on these differences, the ALJ found Dr. Hernandez's opinion unpersuasive.

(*Id.*, PageID.37).  In short, the ALJ properly supported her rejection of Dr.

Hernandez's opinion by finding that Dr. Hernandez is a primary care physician

whose brief opinion lacked detailed reasoning or specific clinical testing results

and was based on prior, rather than current treatment, whereas Dr. Abramsky is a

mental health professional whose opinion was "well supported by [her] detailed

mental status examination, which reflected some clinical abnormalities, but

nothing to suggest marked limitations."  (*Id.*).

### 3.   Discussion

Under § 404.1520c(b)(2), the ALJ must specifically address the factors of

supportability and consistency.  Supportability means that "[t]he more relevant the

objective medical evidence and supporting explanations presented by a medical

source are to support his or her medical opinion(s) or prior administrative medical

finding(s), the more persuasive the medical opinions or prior administrative

medical finding(s) will be."  § 404.1520c(c)(1).  Consistency means that "[t]he

27

Case 2:23-cv-11085-LVP-KGA   ECF No. 13, PageID.1114   Filed 07/17/24   Page 28 of 41

more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." § 404.1520c(c)(2).  Further, the ALJ is required to provide a "sufficiently detailed articulation of application of those factors in which the ALJ must show their work, i.e., to explain in detail how the factors actually were applied to each medical source." *Huizar v. Comm'r of Soc. Sec.*, 610 F. Supp. 1010, 1020 (E.D. Mich. 2022) (cleaned up).  In other words, the regulations "require that the ALJ provide a coherent explanation of his reasoning." *Lester v. Saul*, No. 5:20-CV-01364, 2020 WL 8093313, at *14 (N.D. Ohio Dec. 11, 2020), *report and recommendation adopted sub nom. Lester v. Comm'r of Soc. Sec.*, 2021 WL 119287 (N.D. Ohio Jan. 13, 2021).

Plaintiff argues the ALJ erred by rejecting Dr. Hernandez's medical opinion and instead basing her RFC assessment primarily on the level of mental limitation that Dr. Abramsky found when conducting Plaintiff's mental examination.  (ECF No. 8, PageID.603-609).  As noted above, the ALJ is only *required* to discuss supportability and consistency, as she did here.  The other factors are still to be considered, but in the absence of an egregious error, a decision should not be remanded for failing to discuss these factors.

Here, the ALJ adequately discussed the supportability and consistency of Dr.

Hernandez's opinion, finding that it lacked detailed reasoning and was contradicted by the opinion of Dr. Abramsky. (*Id.*, PageID.37-38). Her finding that it was not persuasive is supported by substantial evidence. The ALJ fully considered the opinion and explained why it was unpersuasive, noting first that it was "not sufficiently supported by strong enough reasoning for the significantly disabling restrictions." (*Id.*, PageID.37). Dr. Hernandez's opinion consisted largely of one-word answers, circles, and checkmarks, that provided no supporting findings or lab/test results. (*Id.*, PageID.694-95). Thus, the ALJ reasonably found this opinion, without any substantial elaboration, did not support the marked limitations that Dr. Hernandez claimed existed. (*Id.*, PageID.37-38).[10] In further articulating the supportability factor, the ALJ then referred to Plaintiff's lack of current treatment with Dr. Hernandez, which reasonably called into question whether the doctor was up to date on Plaintiff's condition and current functioning, and thus addressed the opinion's ultimate reliability. (*Id.*, PageID.38). Finally, the ALJ said that "the opinion as to psychiatric functioning is inconsistent with the opinion from Dr. Abramsky, . . . who is a professional in the mental health field." (*Id.*).

_____

[10] Many cases have found that such check-box opinions are entitled to little weight. *See, e.g.*, *Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 474 (6th Cir. 2016); *Ellars v. Comm'r of Soc. Sec.*, 647 F. App'x 563, 566 (6th Cir. 2016); *Smith v. Comm'r of Soc. Sec.*, No. 13-12759, 2015 WL 899207, at *15 (E.D. Mich. Mar. 3, 2015) (citing cases); *Ashley v. Comm'r of Soc. Sec.*, No. 1:12–cv–1287, 2014 WL 1052357, at *8 n. 6 (W.D. Mich. Mar. 19, 2014) (citing cases).

Put another way, the ALJ discounted the marked limitations that Dr. Hernandez set

forth because she was not a mental health specialist, unlike Dr. Abramsky, who, as

a psychiatric specialist, opined that Plaintiff experienced no more than moderate

limitations in any of the four areas of mental functioning.  (*Id.*, PageID.38, 607).

As evidence that Dr. Hernandez's opinion was inconsistent with Dr.

Abramsky's opinion, the ALJ accurately summarized each doctor's findings and

noted the inconsistency between Dr. Hernandez's diagnosis of marked limitations

in all areas of mental functioning and Dr. Abramsky's diagnosis of only moderate

limitations in ***some*** areas of mental functioning.  (*Id.*, PageID.38).  The ALJ also

extensively reviewed the medical record evidence, including the disability

determination services (DDS) physicians' records, in which Dr. Colin King stated

that Plaintiff "remain[ed] capable of managing simple tasks mentally within a work

environment with only routine predictable work stressors."  (*Id.*, PageID.101).

After Plaintiff filed for reconsideration of the disability determination, Dr. Edward

Czarnecki reviewed the available medical record evidence and found that Plaintiff

"retain[ed] the mental capacity for simple, routine, repetitive tasks with brief,

occasional and superficial social interaction."  (*Id.*, PageID.116).  After reviewing

these determinations, the ALJ noted that she was "generally persuaded by the State

agency psychiatric opinions, as they are well supported by detailed reasoning for

the proposed limitations."  (*Id.*, PageID.38).  The ALJ's only caveat was that the

limitations related to Plaintiff's ability to adapt and manage himself conflicted with

his own statements to Dr. Harold Nims, the consultative examiner, on August 5,

2020, that he cared for his own needs, including cleaning and cooking, and that he

was independent in self-care tasks outside of some physical limitations with getting

on his socks.  (*Id.*, PageID.610).  And while Dr. Hernandez opined that Plaintiff

had marked limitation in interacting with others, Plaintiff himself denied any

problems in this area when being examined by Dr. Nims.  (*Compare id.*,

PageID.694, *with* PageID.320).

    Plaintiff then argues that the ALJ's reasoning was not coherent because the

ALJ did not specifically address the narrative portions of Dr. Hernandez's opinion

and speculates that the ALJ might not have reviewed the entire medical opinion.

According to Plaintiff, this failure means the ALJ failed to provide a "logical

bridge" between the medical opinion and her conclusion and cites one persuasive

case, *Collier v. Comm'r of Soc. Sec. Admin.*, to support his contention.  No. 3:16-

cv-02077, 2018 WL 2193965, at *2 (M.D. Tenn. May 14, 2018).  The undersigned

finds this argument unavailing.  It is well-settled that an ALJ need not evaluate

each part of an opinion to show that the entire opinion was considered and properly

discredited.  *See Bayes v. Comm'r of Soc. Sec.*, 757 F. App'x 436, 445 (6th Cir.

2018) ("[T]he ALJ was not required to explain every piece of evidence in the

record. . . . An 'ALJ can consider all the evidence without directly addressing in

his written decision every piece of evidence submitted by a party.'" (quoting *Loral Defense Sys.–Akron v. NLRB*, 200 F.3d 436, 453 (6th Cir. 1999))).  Further, Plaintiff's reliance on *Collier* is misplaced for two reasons.

First, *Collier* is distinguishable from the instant case because it was decided under the old agency regulations for evaluating medical opinion evidence, which generally required an ALJ to give more weight to medical opinions from treating physicians.  Under that regulation, commonly referred to as the treating physician rule, if a treating physician's opinion was well-supported and consistent with the other substantial evidence in the record, the ALJ was required to give the opinion controlling weight.  20 C.F.R. § 404.1527.  The old regulations applied to disability claims that were filed before March 27, 2017, and are inapplicable for this claim.  20 C.F.R. § 404.1520c.  Under the revised regulations that apply to this claim, the Commissioner no longer defers or gives controlling weight to a claimant's treating medical sources and an ALJ no longer assigns "weight" to the medical opinions/findings at all.  20 C.F.R. § 404.1520c(a).

Second, in *Collier*, the ALJ accepted the claimant's treating physician opinion and gave it "significant weight" but then formulated an RFC that was less limited than what the treating physician had concluded *and* the ALJ did not provide an explanation for why the RFC allowed light work when the treating physician had limited claimant to simple, routine tasks only for short periods.

*Collier*, 2018 WL 2193965, at *2.  Here, the ALJ did not accept the opinion of Dr.

Hernandez and instead specifically found that her opinion was unpersuasive.  (ECF

No. 4-1, PageID.37).

    As for consistency, as discussed in more detail above, the ALJ compared Dr.

Hernandez's opinion regarding Plaintiff's mental functioning with the opinion of

Dr. Abramsky, and reasonably found Dr. Hernandez's opinion to be inconsistent.

(*Id.*, PageID.38).  In doing so, the ALJ emphasized the fact that Dr. Hernandez was

a primary care provider whereas Dr. Abramsky was a psychiatric specialist, and as

such, more experienced in assessing psychological functioning.  (*Id.*).  Thus, the

ALJ again complied with the articulation requirement to discuss the consistency

factor as set forth in the revised regulations. 20 C.F.R. § 404.1520c(c)(2).

    Plaintiff might wish "the ALJ had interpreted the evidence differently."

*Glasgow v. Comm'r of Soc. Sec.*, No. 2:15-CV-1831, 2016 WL 2935666, at *7

(S.D. Ohio May 20, 2016), *report and recommendation adopted*, 2016 WL

4486936 (S.D. Ohio Aug. 26, 2016), *aff'd*, 690 F. App'x 385 (6th Cir. 2017).  But

the law prohibits the Court from re-weighing the evidence and substituting its

judgment for the ALJ's.  *See Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411,

414 (6th Cir. 2011) (citing *Youghiogheny & Ohio Coal Co. v. Webb*, 49 F.3d 244,

246 (6th Cir. 1995) ("This court reviews the entire administrative record, but does

not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide

questions of credibility, or substitute its judgment for that of the ALJ.")).  Because the ALJ properly evaluated and discussed the supportability and consistency of Dr. Hernandez's opinions, the ALJ has satisfied the requirements of the regulations. *See* 20 C.F.R. § 404.1520c(b)(2).

C.    Listing 11.04 Evaluation

1.    Discussion

Plaintiff makes two arguments as to why the ALJ failed to adequately discuss the supportability of the ALJ's finding that Plaintiff's limitations did not meet or medically equal Listing 11.04 and rehashes his argument that the ALJ did not properly consider the medical opinion of Dr. Hernandez.  (*Id.*, PageID.1048-1051).  First, Plaintiff submits that the ALJ did not properly analyze Listing 11.04 and merely articulated the listing requirements at Step 3 before concluding Plaintiff did not meet them.  (*Id.*).  Second, Plaintiff concedes that the ALJ properly analyzed the Paragraph B criteria to assess Plaintiff's mental functioning but argues that the ALJ did not account for several treatment notes, particularly those from Dr. Hernandez, that suggested greater than moderate mental limitations. (*Id.*).  And because the ALJ considered opinion evidence beyond the three-month post-stroke window in making her determination, Plaintiff argues that this constitutes inadequate listing analysis and therefore shows there was no meaningful review of the specific listing requirements of Listing 11.04.  (*Id.*).

34

In support of his argument that the ALJ failed to properly analyze the requirements of Listing 11.04, Plaintiff cites two cases: *Willis v. Comm'r of Soc. Sec. Admin.*, No. 2:19-CV-11689, 2020 WL 1934932, at *5 (E.D. Mich. Apr. 22, 2020), and *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011).  Neither case is persuasive, as explained below.

First, *Willis* dealt with a situation where an ALJ made no mention of the claimant's equivalency argument nor did the ALJ make even a passing reference to the listing requirements in question, unlike the ALJ in this case, before concluding that the claimant's impairments did not meet or medically equal the severity of a listed impairment.  *Willis*, 2020 WL 1934932, at *6.  Plaintiff's reliance on *Reynolds* fares no better, as *Reynolds* involved a claimant who had both mental and physical impairments, yet the ALJ in that case only analyzed the claimant's physical impairments in Step Three, completely skipping any analysis of claimant's mental impairments, again unlike the ALJ in this case, before moving on to the next step in the 5-step analysis.  *Reynolds*, 424 F. App'x at 415-416.

In contrast to the cases cited by Plaintiff, the Commissioner cites to cases highlighting that the Sixth Circuit has rejected a heightened articulation standard for ALJ's at Step Three, noting that "the ALJ is under no obligation to spell out 'every consideration that went into the step three determination' or 'the weight he gave each factor in his step three analysis.'" *Staggs v. Astrue*, 2011 WL 3444014,

35

at *3 (M.D. Tenn. Aug. 8, 2011) (quoting *Bledsoe v. Barnhart*, 165 F. App'x 408,

411 (6th Cir. 2006)).  Further, the *Bledsoe* court "endorsed the practice of

searching the ALJ's entire decision for statements supporting his step three

analysis," noting that it is not necessary to have a section devoted specifically to

step three.  *Staggs*, 2011 WL 3444014, at *3.  Accordingly, the undersigned may,

and has, examined all of the ALJ's findings throughout the decision to determine

whether they support the ALJ's step three analysis.

Here, the ALJ reasonably concluded that the evidence did not support the

severity that Listing 11.04 required.  (ECF No. 4-1, PageID.32-33).  To satisfy

Listing 11.04C(2), an individual must show marked limitation in physical

functioning and marked limitation in interacting with others, "both persisting for at

least 3 consecutive months after the insult [(cause of injury)]."  20 C.F.R. Pt. 404,

Subpt. P., App.'x 1, § 11.04C.  To demonstrate a marked limitation in physical

functioning, one must be "seriously limited in the ability to independently initiate,

sustain, and complete work-related physical activities . . . such as standing,

balancing, walking, using both upper extremities for fine and gross movements, or

results in limitations in using one upper and one lower extremity."  *Id.* at §

11.00G(2)a.  Additionally, "[t]he limitation in [one's] physical functioning must

last or be expected to last at least 12 months."  *Id.* at § 11.00G(3)a.

After reviewing the evidence, the ALJ reasonably concluded that Plaintiff's

impairments, while limiting, did not rise to the level of a marked limitation in

physical functioning. (ECF No. 4-1, PageID.32). In support, the ALJ documented

Plaintiff's objective findings that followed his February 2018 stroke throughout the

decision. (*Id.*, PageID.32-38). That is enough to meet the Sixth Circuit's

requirements. *See Bledsoe*, 165 F. App'x. at 411 (finding that the ALJ

appropriately considered a claimant's combined impairments at step three in part

because he "described evidence pertaining to all impairments, both severe and

nonsevere, for five pages earlier in his opinion and made factual findings");

*Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014) (citing

*Bledsoe*) ("[T]he ALJ made sufficient factual findings elsewhere in his decision to

support his conclusion at step three.").

Specifically, the ALJ found that by March 6, 2018, (less than one month

post-stroke), Plaintiff reported that use of his left arm and hand had improved

considerably and "he fe[lt] he could be independent" in his daily care. (ECF No.

4-1, PageID.34, 443). By April 11, 2018, (two months post-stroke), the ALJ noted

Dr. Hernandez's opinion that Plaintiff used a cane, but "no longer [was] in a

wheelchair;" and by April 24, 2018, the ALJ noted that Plaintiff was able to

ambulate without an assistive device in the clinic, though he continued to use a

rolling walker at the insistence of his wife and only when he came to physical

therapy. (*Id.*, PageID.34, 427, 443, 584). The ALJ also noted that on May 10,

37

2018, (three months post-stroke), Plaintiff walked with just a cane in his right hand and exhibited only mild stiffness in his left lower extremity. (*Id.*, PageID.34, 423). And just one week later, on May 17, 2018, Plaintiff expressed a desire to return to work as a police officer in a jail. (*Id.*, PageID.422). The ALJ also described further improvements in Plaintiff's physical functioning, (*Id.*, PageID.34-38), such as:

- a June 2018 medical record noting Plaintiff had minimal difficulty with meal preparation, housecleaning, yardwork, and other home management tasks; (*Id.*, PageID.418); and

- an August 2020 medical record where Plaintiff decided to discontinue treatment, stating "I don't think I need it." (*Id.*, PageID.785).

Accordingly, the ALJ reasonably concluded that Plaintiff's stroke did not result in marked limitation in physical functioning for at least three consecutive months after the insult (cause of injury), as the listing requires. 20 C.F.R. Pt. 404, Subpt. P., App.'x 1, § 11.04C.

Plaintiff's second argument, that it was error for the ALJ to consider medical evidence beyond the immediate three month post-stroke window, suffers from a misunderstanding of the requirements of the listing at issue. While Listing 11.04 requires the limitations to "persist[] for at least 3 consecutive months after the insult," this does not mean that the three consecutive months of limitations must

38

occur in the three months immediately following the cerebrovascular accident.  20

C.F.R. Pt. 404, Subpt. P., App.'x 1, § 11.04.  In fact, the Commissioner's rules

require the ALJ to consider "***all*** evidence in [the] case record when [making] a

determination or decision whether [a claimant is] disabled."  20 C.F.R. §

404.1520(a)(3) (emphasis added).

Ultimately, Plaintiff bears the burden of proving he is disabled.  *See* 20

C.F.R. §§ 404.1512, 416.912.  The undersigned agrees with the Commissioner that

Plaintiff has not met this burden, but instead asks the Court to impermissibly

reweigh the evidence.  *Mullins v. Sec'y of Health & Hum. Servs.*, 680 F.2d 472

(6th Cir. 1982).  Instead, the undersigned finds that the ALJ's opinion is supported

by substantial evidence based on the record before the Court, which is all that is

required to affirm the ALJ's decision.  *See Blakley*, 581 F.3d at 406 (holding that

"if substantial evidence supports the ALJ's decision, this Court defers to that

finding even if there is substantial evidence in the record that would have

supported an opposite conclusion." (internal quotations omitted)).  Because the

ALJ's Listing 11.04 determination is supported by substantial evidence, her

decision should be affirmed.

## VI.    Conclusion

In the end, the ALJ found Plaintiff was disabled after March 7, 2021, but not

before that date.  Prior to that date, his impairments did not rise to the level of

precluding Plaintiff from performing work consistent with the RFC crafted by the

ALJ.  Substantial evidence supports the Commissioner's decision that Plaintiff was

not disabled prior to March 7, 2021, within the meaning of the Act.

Accordingly, for the reasons stated above, the undersigned

**RECOMMENDS** that Plaintiff's motion for summary judgment, (ECF No. 8), be

**DENIED**; the Commissioner's motion for summary judgment, (ECF No. 11), be

**GRANTED**; and the ALJ's decision be **AFFIRMED**.


Dated: July 17, 2024                        s/Kimberly G. Altman
Detroit, Michigan                           KIMBERLY G. ALTMAN
                                            United States Magistrate Judge

## <u>NOTICE TO PARTIES REGARDING OBJECTIONS</u>

The parties to this action may object to and seek review of this Report and

Recommendation.  Any objections must be filed within 14 days of service, as

provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).

Failure to file specific objections constitutes a waiver of any further right of

appeal.  *Thomas v. Arn*, 474 U.S. 140, 144 (1985); *Howard v. Sec'y of Health &*

*Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991).  Filing objections that raise some

issues but fail to raise others with specificity will not preserve all the objections a

party might have to this Report and Recommendation.  *Willis v. Sec'y of Health &*

*Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of*

40

*Teachers, Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Under Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc.  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.  If the court determines that any objections are without merit, it may rule without awaiting the response.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on July 17, 2024.

s/Carolyn Ciesla
CAROLYN CIESLA
Case Manager

41